David Paoli
Paoli Law Firm
257 W. Front St., Suite A
Missoula, MT 59801
Telephone: (406)-542-3330
Fascimile: 406-542-3332
Davidpaoli@paoli-law.com

James H. Kaster (pro hac vice application forthcoming)
Lucas J. Kaster (pro hac vice application forthcoming)
Nichols Kaster, PLLP
4600 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
kaster@nka.com
lkaster@nka.com
Telephone: (612) 256-3200
Facsimile: (612) 338-4878

ATTORNEYS FOR PLAINTIFF

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

---

| | |
|---|---|
| MICHAEL A. FROST, | Case No. _____ |
| Plaintiff, | |
| vs. | **COMPLAINT** <br> **(JURY TRIAL DEMANDED)** |
| BNSF RAILWAY COMPANY, | |
| Defendant. | |

---

COMES NOW the Plaintiff, Michael A. Frost, by and through his attorneys, Nichols Kaster, PLLP and David R. Paoli, and respectfully states the following:

## NATURE OF CASE

1. Defendant BNSF Railway Company ("BNSF or "Defendant") violated the employee protection provisions of the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA") by retaliating against its employee, Plaintiff Michael A. Frost ("Frost").

## THE PARTIES

2. Frost is an individual residing in Great Falls, Montana. At all relevant times, he was employed as a track worker by Defendant, and has worked for Defendant since June 2011.  At all relevant times, Frost was a member of the Brotherhood of Maintenance of Way Employees Division ("BMWED"), a national labor organization representing rail workers who build and maintain track and structures throughout the United States

3. Defendant is a foreign corporation with its headquarters at 2650 Lou Menk Drive in Fort Worth, Texas, with a Montana Intermodal Facility located at 3311 First Avenue South, Billings, Montana.  Defendant is a railroad carrier as defined by 29 C.F.R. § 1982.101(k), and engaged in the operation of a system of railways as a common public carrier of freight for hire between the various states

of the United States, and engaged in interstate commerce by railroad.

## JURISDICTION & VENUE

4.     Frost's claims arise under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. §20109 (2008).  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.  The acts complained of occurred in this judicial district and gave rise to the claims alleged.  Moreover, Defendant operates trains in the transportation of freight in the state of Montana, and at all relevant times engaged in business in this District.

6.     Frost has satisfied all preconditions to suit.

## FACTUAL ALLEGATIONS

### FROST IS INJURED WHILE WORKING FOR DEFENDANT

7.     On Wednesday, April 18, 2012, Frost was laboring as a section-man on Steel Gang RP21 on BNSF's mainline, approximately 70 miles west of Whitefish, Montana.

8.     The Steel Gang was under the supervision of Roadmaster Jason Peterson ("Peterson") and Foreman Gary Schultz ("Schultz").

9.     Because the Steel Gang was laboring on the track, it was important for Defendant to ensure on-track safety by ensuring that no trains came through during the time period during which the Steel Gang was at work on the track.

3

10.     The method in use to ensure that no train came through while the Steel Gang was working is the "track and time" authority described by the Federal Railroad Administration ("FRA") Roadway Worker Protection ("RWP") regulations, 49 C.F.R. Part 214, Subp. C.

11.     The two supervisors, Peterson and Schultz, were the employees in charge, and under the RWP rules they had sole authority to obtain track and time protection for workers, and to release that protection if (and only if) all workers had been cleared off the track.

12.     Thus Peterson and Schultz had the power and the absolute duty to ensure that the track and time protection was safely in place at all times for the Steel Gang, and to be informed and certain that all workers were off the track and in the clear before releasing the track protection.

13.     As Frost and his co-workers on the Steel Gang worked to perform their assigned tasks, Peterson and/or Schultz released the track and time protection without first clearing Frost and his co-workers from the track, and without informing them that the track and time protection was no longer in place.

14.     After the track and time protection had been released, a freight train traveled through the work site at full track speed of about 60 miles per hour. Frost, under the belief that his track and time protection was in place, and wearing hearing protection, did not realize that the train was coming. He looked

4

up just in time, when the train was a mere 30 to 40 feet away. Frost jumped out of the way of the oncoming train, narrowly avoiding serious injury or death. As he jumped out of the way, he was spun around by the wind tunnel effect of the speeding freight train.

15.    Others on the Steel Gang also escaped getting hit by the train. However, they were not so close to impact as to have been caught in the wind tunnel effect of the passing train.

## FROST SEEKS TREATMENT AND REPORTS
## HIS WORK-RELATED INJURY TO DEFENDANT

16.    Following the near-miss, Frost asked to be taken to a medical facility and examined by medical professionals. This is protected activity under subsection (c)(1) of the FRSA. Defendant delayed action on his request, however, while railroad officials took statements and carried out other procedures.  When Frost finally was taken to the hospital, he was diagnosed with post-traumatic stress disorder.

17.    Subsequently, Frost filed an injury report with Defendant, which is protected under subsection (a)(4) of the FRSA, and requested counseling, which is protected under subsection (c)(2) of the statute. Counseling was not provided. In fact, although BNSF stated publicly that the crew had been given time off and offered counseling, the crew was ordered back on the tracks the next morning. The crew members refused to work until they had a proper job briefing and proof

5

that they were protected with adequate supervision.

18.     Frost and his coworkers reported to upper managers that the supervisors had released their track protection. All affirmed that the sole employees in charge were their two supervisors, Schultz and Peterson. This report is also protected under subsection (a)(1)(c) of the FRSA.

19.     In these reports, Frost and his coworkers alleged serious violations by their supervisors of the RWP regulations. Such reporting is protected activity under subsection (a)(1)(c) of the FRSA, which prohibits retaliation against employees reporting violations of federal rail safety laws and regulations.

## FROST IS DISCIPLINED BY DEFENDANT

20.     Two days after narrowly avoiding being struck by the train, Frost was charged by Defendant with violating its rules by "fouling the track," and instructed to attend an investigative hearing, which was eventually held on July 11, 2012 in Havre, Montana.

21.     The investigative hearing is an internal process whereby the company appoints a hearing officer to take testimony from the employees involved. The hearings are not a neutral forum where an employee's responsibility for a safety violation is fairly and independently determined; rather, they are a perfunctory means to assign blame to employees regardless of their actual responsibility for safety violations. For example, the hearing officers,

who act as both prosecutor and judge, are members of management who are appointed by the company; the hearing officers have no legal training; employees do not have legal counsel present; the rules of evidence do not apply and employees are frequently found responsible based entirely on hearsay; the company can compel witnesses to appear but employees cannot; the company conducts an investigation prior to the hearing but does not provide discovery, including exculpatory evidence, to the charged employee; and the hearings typically take less than one day. The punishment following hearings is more severe than if the employee had waived his or her right to a hearing (i.e., Defendant punishes employees for insisting on their right to hearing), and it is well known that hearings are almost always decided in favor of the railroad.

22.     Following the July 11 investigative hearing, on August 9, 2012, Frost was found by Defendant to be guilty of two rules violations: Rule 1.20, Alert to Train Movement, and Rule 12.1, Occupying Track Adjacent to Live Tracks. He was given a 30-day record suspension, and a three-year "review period." The "review period" is equivalent to being placed on probation. It means that any subsequent safety rule that Frost was found by Defendant to have violated would result in strong discipline to Frost; likely dismissal. Both the record suspension and the "review period" are considered by Defendant to be disciplinary actions.

23.     All of Frost's coworkers were shaken up by the near-miss, but only Frost asked to be seen by medical or counseling personnel. None of Frost's coworkers (excepting the supervisors) was disciplined by Defendant as a result of the near-miss.

24.     On October 9, 2012, Frost filed a claim with OSHA. Such filing is a protected act.

25.     Following his filing, in early November 2012, Frost was accused of not having knowledge of his track authority and questioning the authority after the fact. An investigative hearing was held on January 30, 2013, at which it was determined that Frost did, indeed, have track authority.

26.     Nevertheless, Defendant dismissed Frost on February 22, 2013, citing the discipline that had been given to Frost following the April 18, 2012 incident in which Frost was nearly hit by the train. The dismissal was necessarily based on that discipline, and on the alleged November, 2012 incident.

27.     Defendant subsequently agreed to reinstate Frost with back pay on May 17, 2013.

28.     However, the three-month dismissal hurt Frost financially: he had, by this time, delinquent mortgage and child support obligations, with penalties and surcharges imposed. Further, the back pay did not cover any overtime, travel costs, or per diem payments that Frost might have earned during the period he

was out of work.

29.     Defendant also made the dismissal part of Frost's employment record, and gave him three more years of probation.

30.     Because of his probationary status, Frost does not apply for higher paying positions because those jobs would provide his managers with additional opportunities to find fault with him, discipline him, and perhaps cause Frost's termination.

31.     Frost lives and works each day with ongoing anxiety created by frequent surveillance and hostility. This anxiety is in addition to the symptoms of his post-traumatic stress disorder from being nearly hit by a train.

32.     On October 9, 2012, Frost filed a complaint with the Department of Labor's Occupational Safety and Health Administration ("OSHA"), alleging that he was discriminated against in violation of the Federal Rail Safety Act, 49 U.S.C. §20109.  Frost later filed an amended complaint on January 16, 2014.

33.     On July 14, 2015, Frost filed a Notice of Intention to File an Original Action in United States District Court with OSHA related to his FRSA complaint.

## CAUSE OF ACTION

## VIOLATION OF 49 U.S.C. § 20109

34.     Frost incorporates the foregoing paragraphs of his Complaint by this

reference.

35.     Frost brings this claim under the Federal Railroad Safety Act, 49 U.S.C. § 20109 (2008) ("FRSA"). The purpose of the FRSA is "to promote safety in every area of railroad operations." 49 U.S.C. § 20101.

36.     The FRSA was amended in 2007 to include anti-retaliation protections for railroad employees. See Araujo v. New Jersey Transit Rail Operations, Inc., 708 F.3d 152, 156 (3rd Cir. 2013). Under the newly amended FRSA, an employer may not discriminate against employees for, among other things, reporting safety violations. Id. "The legislative history of [the amendments to the FRSA] reflects that the changes were intended to 'enhance the oversight measures that improve transparency and accountability of the railroad carriers' and that '[t]he intent of this provision is to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers.'" Id. at 161 n.3 (citations omitted).

37.     Under the amended FRSA, an employee must "show, by a preponderance of the evidence, that '(1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.'" Id. at 157 (quoting Allen v. Admin. Review Bd., 514 F.3d 468, 475-76 (5th Cir. 2008)). Once that burden is met, the

employer must show, "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." Id. (citation omitted).

38.    Section 20109 provides, in relevant part, that a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the lawful, good faith act done, or perceived by the employer to have been done or about to be done…to provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security." Section 20109 also prohibits retaliation for "reporting, in good faith, a hazardous safety or security condition."

39.    **Protected Activity**: Frost engaged in protected activity by requesting to be taken to a medical facility, requesting counseling, making reports regarding Defendant's safety violations, and filing a claim with OSHA.

40.    **Knowledge of Protected Activity**: Defendant knew that Frost had engaged in protected activity when it took adverse action against him.

41.    **Adverse Action**: Defendant took adverse action against Frost when it charged him with "fouling the track" after Frost's near-miss, subjected him to

11

investigatory hearings, found him guilty of "fouling the track," gave him a 30-day record suspension, gave him a three-year "review period," charged him with not having knowledge of his track authority and questioning the authority after the fact, and then dismissed him.

42.     **Protected Activity as a Contributing Factor in the Adverse Action**: Defendant's adverse actions against Frost resulted directly from his engaging in protected activity. This is evidenced by the fact that Defendant disciplined only Frost, and none of the other coworkers in the vicinity of the near-miss (none of the coworkers requested care following the incident).

43.     **Damages** – As a result of Defendant's conduct, Frost is entitled to all damages available under the FRSA, 49 U.S.C. § 20109, including any back pay with interest, compensatory damages, and punitive damages.  Plaintiff is also entitled to attorneys' fees and costs incurred in connection with this claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Frost prays for judgment against Defendant, as follows:

1.      That the practices of Defendant complained of herein be determined and adjudged to constitute retaliation in direct violation of the FRSA, 49 U.S.C. § 20109;

2.      For an award of damages under the FRSA arising from loss of past and future income, compensatory damages, mental anguish and emotional distress damages, and other damages, in an amount in excess of $75,000;

3.      For an award of punitive damages under the FRSA;

4.      For Plaintiff's costs (including litigation and expert costs), disbursements and attorneys' fees pursuant to the FRSA;

5.      For all further relief available under the FRSA;

6.      For such other and further relief available by statute; and

7.      For such other and further relief as the Court deems just and equitable.

**THE PAOLI LAW FIRM**

Dated: September 24, 2015      /s/ David R. Paoli_____
David Paoli
257 W. Front St., Suite A
Missoula, MT 59801
Telephone: (406)-542-3330
Fascimile: 406-542-3332
Davidpaoli@paoli-law.com

**NICHOLS KASTER, PLLP**

James H. Kaster (MN #53946)
Lucas J. Kaster (MN No. 396251)
4600 IDS Center
80 South Eight Street
Minneapolis, MN  55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
kaster@nka.com
lkaster@nka.com

**ATTORNEYS FOR PLAINTIFF**