IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MICHAEL A. FROST, | CV 15–124–M–DWM |
| Plaintiff, | |
| vs. | ORDER |
| BNSF RAILWAY COMPANY, | |
| Defendant. | |

Pending before the Court are Defendant BNSF's Motion for a Protective Order (Doc. 28), Motion for Partial Summary Judgment (Doc. 30), Motion to Bifurcate (Doc. 36), Motion in Limine (Doc. 38), and Motion to Strike (Doc. 42). Also pending are Plaintiff Michael Frost's Motion to Compel (Doc. 26), Motion in Limine (Doc. 39), and Motion to Extend the Discovery Deadline (Doc. 54). A hearing was held on the motions on October 26, 2016.

## BACKGROUND

Plaintiff Michael Frost ("Frost") is an employee of BNSF and was at all times relevant to this action a member of the Brotherhood of Maintenance of Way Employees Union. (Doc. 47 at ¶¶ 1-2.) The Union has a collective bargaining agreement with BNSF, which includes various rules regarding per-diem, travel

expenses, and overtime payments. (*Id.* at ¶ 3.) Pursuant to Federal Railroad Administration regulations, 49 C.F.R. § 225.33(a)(1), BNSF maintains an Internal Control Plan which sets forth BNSF policy regarding accident and injury reporting by BNSF employees. (*Id.* at ¶ 4(f); Doc. 32 at 37.)

On April 18, 2012, Frost labored with a steel gang near Brimstone, Montana. (Doc. 47 at ¶ 5.) A train sped through adjacent to the track on which his crew was working, narrowly missing him. (*Id.* at ¶ 6.) Frost alleges he was injured by this near miss, and that railroad officials delayed taking him to a medical examination he requested while they took statements and carried out other procedures. (*Id.* at ¶¶ 8, 9.) BNSF alleges it insisted Frost be medically evaluated. (*Id.*) In any event, an assistant foreman drove Frost to the hospital minutes after the near-miss. (*Id.* at ¶ 9.) There Frost asserts he was diagnosed with early signs of Post-Traumatic Stress Disorder. (*Id.* at ¶ 60.) Frost claims he requested counseling, but was not provided any. (*Id.* at ¶ 10.) However, both parties agree that BNSF did refer him to its Employee Assistance Program ("Assistance Program"). (*Id.* at ¶ 11.) Frost claims the Assistance Program initially provided him with a wrong number for the doctor it recommended, but both parties again agree that after Frost requested a second referral BNSF provided a list of doctors and numbers to call. (*Id.* at ¶ 12.) Frost did not contact any of these providers.

(*Id.* at ¶ 13.)  Frost asserts this decision resulted from being too geographically

distant from the providers.  (*Id.*)

BNSF subsequently served Frost with a Notice of Investigation dated April

20, 2012.  (*Id.* at 15.)  The Notice informed him an investigation into the April 18

near-miss had been scheduled "for the purpose of ascertaining the facts and

determining [his] responsibility, if any, in connection with your [Frost's] alleged

fouling the track."  On April 23, 2012, Frost completed a BNSF employee

personal injury/occupational illness report.  (*Id.* at ¶ 14.)  In it, he described his

injuries from the near-miss as "PTSD following [a] traumatic incident."  (*Id.*)

After a BNSF investigatory hearing on July 11, 2012, BNSF notified Frost

he had been found in violation of BNSF Maintenance of Way Operating Rules

1.20 (Alert to Train Movement) and 12.1 (Occupying Track Adjacent to Live

Tracks) and assessed a 30-day record suspension and 36-month review period.

(*Id.* at ¶ 18.)  On October 9, 2012, Frost, having retained counsel, filed a complaint

with the Occupational Safety and Health Administration ("OSHA").  (*Id.* at ¶ 28.)

The complaint alleged BNSF retaliated against him in violation of the Federal

Railroad Safety Act after he sought medical treatment and reported his injury

following the near-miss.  (*Id.* at ¶ 95.)  Frost filed an amended complaint with

OSHA on January 13, 2014.  (*Id.* at ¶ 28.)

On November 12, 2012, BNSF served Frost with another Notice of Investigation, this one related to an incident in Wyoming in which Frost "alleged[ly] foul[ed] main track without knowledge of any track authority by setting onto main track BNSF 23001 Grapple Truck and then questioning what the authority was after the fact." (*Id.* at ¶ 20.) After an investigatory hearing on January 30, 2013, BNSF dismissed Frost from its employment with a letter dated February 22, 2013. (*Id.* at ¶ 22.) On May 17, 2013, BNSF reinstated Frost with back pay, and Frost signed a Reinstatement Letter. (*Id.* at ¶ 24.) The discipline related to the near-miss of April 18, 2012, was removed from Frost's employment record. (*Id.* at ¶ 27.)

Frost filed this action on September 24, 2015. (Doc. 1.) He alleges BNSF violated the Federal Railroad Safety Act, 49 U.S.C. § 20109, by retaliating against him for engaging in the protected activity of requesting medical attention following the near-miss, requesting counseling, making reports regarding what he believes were BNSF safety violations, and filing a claim with OSHA. (*Id.* at 11.) He requests compensatory, emotional distress and anguish, loss of past and future income, and other damages. (*Id.* at 12.) He also requests an award of punitive damages. (*Id.* at 13.)

## I.     BNSF's Motion for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

BNSF moves for partial summary judgment on four of Frost's Federal Railroad Safety Act claims: (1) Frost's claims for per diem, travel expenses, and overtime pay; (2) Frost's claim for punitive damages; (3); Frost's claims arising from his 2013 discipline; and (4) Frost's claim that BNSF interfered with or delayed his medical treatment. (Doc. 30 at 2.) That motion is denied.

## A. Per diem, travel expenses, and overtime pay

BNSF argues for summary judgment on Frost's claims for per diem, travel expenses, and overtime pay because (1) the Railway Labor Act preempts Frost's claims. (Doc. 34 at 3), (2) the damages are not reasonably ascertainable and are speculative. (*Id.* at 6), and (3) the claims are precluded by accord and satisfaction. (*Id.* at 7.) BNSF's arguments are unsuccessful.

### 1. Railway Labor Act preemption

The Railway Labor Act, 45 U.S.C. §§ 151-88, establishes mandatory

administrative procedures for two classes of labor disputes: major disputes and minor disputes. *Hawaiian Airlines v. Norris*, 512 U.S. 246, 252 (1994). Major disputes concern "the formation or negotiation of collective bargaining agreements." *Id*. Minor disputes concern "'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.'" *Id.* at 253 (quoting *Bhd. of R. R. Trainmen v. Chi. River & Ind. R. R. Co.*, 353 U.S. 30, 33 (1957). BSNF and Frost agree that whether his claim for per diem, travel pay, and overtime pay are preempted by the Railway Labor Act hinges on whether their depends on an interpretation of the Collective Bargaining Agreement. (Doc. 46 at 5; Doc. 56 at 3.) This is because the Railway Labor Act preempts as minor disputes those arising exclusively from a collective bargaining agreement. *Espinal v. Nw. Airlines*, 90 F.3d 1452, 1456 (9th Cir. 1996). On the other hand, "[t]hose claims or causes of action involving rights and obligations that exist independently of the [collective bargaining agreement] are not preempted." *Id.* (citing *Norris*, 512 U.S. at 256).

Frost argues the right he seeks to enforce arises under the Federal Railroad Safety Act, 49 U.S.C. § 20109, not from the Collective Bargaining Agreement or the Railway Labor Act. (Doc. 46 at 4.) The Federal Railroad Safety Act provides as a remedy to a prevailing employee in an enforcement action "all relief necessary

to make the employee whole" as well as "compensatory damages, including compensation for any special damages sustained as a result of the discrimination." 49 U.S.C. § 20109(e)(1),(2). BNSF argues that the Collective Bargaining Agreement governs a workers' entitlement to per diem, travel expenses, and overtime pay, and points out that the Agreement contains rules pertaining to those topics. (Doc. 34 at 5). Frost disputes this assertion "to the extent it implies that the collective bargaining agreement governs" his per diem, travel expenses, and overtime payments claims. (Doc. 47 at ¶ 3.) The Federal Railroad Safety Act's provision of independent recovery undermines BNSF's argument that the Collective Bargaining Agreement is the exclusive source of Frost's claims. Simply showing that the Collective Bargaining Agreement has rules relating to those claims does not demonstrate those rules are exclusive. (Doc. 32 at 24-27.)

## 2. Calculation of damages

BNSF attacks the manner in which Frost calculated his per diem payments because he did not take into account the money he saved on those expenses by not working, and attacks his method of calculating travel expenses because it is based on the amounts earned by a coworker. (Doc. 34 at 6.) Contrary to BNSF's position, a plaintiff does not need to calculate damages with absolute precision; instead, that calculation may be approximate as a matter of "just and reasonable

inference." *Pac. Shores Prop., LLC v. City of Newport Beach*, 730 F.3d 1142, 1170-72 (9th Cir. 2013) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). Moreover, the question of the amount of perdiem, travel expenses, and overtime pay might total is one of fact. Summary judgment on these grounds is inappropriate.

### 3. Accord and satisfaction doctrine

Finally, BNSF argues Frost's claims to per diem, travel, and overtime expenses are precluded by the doctrine of accord and satisfaction. (Doc. 34 at 7.) BNSF asserts that when Frost signed the Reinstatement Letter agreeing to payment "to be made whole for any time lost," he accepted that settlement in lieu of any other legal "debt" BNSF may have owed him. *Id.* Frost argues the Reinstatement Letter did not extinguish all his claim because (1) the terms of the Reinstatement Letter limit its scope to Frost's labor relations grievance process and not Frost's claims under the Federal Railway Safety Act, (Doc. 46 at 7, 9), and (2) BNSF acknowledged that it did not have the legal right under the Collective Bargaining Agreement to have disciplined Frost, and so could not provide valuable consideration for the release. (*Id.* at 9.) "Under federal law, a valid release must be supported by consideration." *Salmeron v. United States*, 724 F.2d 1357, 1362 (9th Cir. 1983). "It is elementary law that giving a party something to which he

has an absolute right is not consideration to support that party's contractual promise." *Id.* Frost shows genuine issues for trial, namely how the letter should be interpreted and its legal sufficiency as an accord and satisfaction, making summary judgment inappropriate.

### B.     Punitive damages

While the Federal Railroad Safety Act provides for punitive damages, it does not specify the standard for awarding those damages. 49 U.S.C. § 20109(e)(3). Frost argues that in the context of employment discrimination, punitive damages are justified where the employer "discriminate[s] in the face of a perceived risk that its actions will violate federal law." *Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001) (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)). BNSF, on the other hand, maintains the correct standard is whether the employer acted with reckless or callous disregard for the plaintiff's rights or intentionally violated federal law. *BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 642 (10th Cir. 2016). Under either standard, however, the nature of BNSF's conduct must still be determined by a finder of fact. For instance, Frost points to what he argues is disparate discipline following the near-miss, where Frost was disciplined but other BNSF employees who were also close to the oncoming train were not. (Doc. 46 at 11-12). Disparate treatment and retaliation

are at the heart of Frost's claim, and Frost's assertions, supported by the record, preclude summary judgment.

### C.    February 22, 2013 discipline and dismissal

Under the Federal Railroad Safety Act, an employee must file an administrative complaint no later than 180 days after the date of the alleged violation.  49 U.S.C. § 20109(d)(2)(A)(ii).  Frost filed an amended complaint on January 13, 2014, more than 180 days after February 22, 2013.  In the analogous context of a Title VII action, "a plaintiff who complains of more than one discriminatory or retaliatory act must timely exhaust administrative remedies as to each."  *Finley v. Salazar*, 2013 WL 1209940, at *2 (D. Mont. Mar. 25, 2013) (citing *N'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  However, "for retaliation claims based on the filing of a complaint . . . administrative exhaustion is not required and subject matter jurisdiction before the district court exists where the retaliation claim is reasonably related to the administrative complaint."  *Id.* (citing *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 644 (9th Cir. 2004).  Frost's October 9, 2012 OSHA complaint alleged BNSF had retaliated against him by disciplining him after he sought medical care; his claims in the instant action also allege retaliation, including that his February 22, 2013 discipline and dismissal was retaliatory.  Frost's current claims are "reasonably

related" to the retaliation Frost alleged in his administrative complaint, and Frost's failure to file within 180 days is excusable.

### D. Interference with medical treatment

The Federal Railroad Safety Act prohibits a railroad from denying, delaying, or interfering with the medical or first aid treatment of an injured employee. 49 U.S.C. § 20109(c)(1). Upon request, the railroad must promptly arrange the transportation of an injured employee to the nearest hospital for treatment. *Id*. Frost claims that BNSF denied him prompt treatment because he had to wait approximately fifteen minutes after requesting medical treatment until a van arrived to take him to the hospital, (Doc. 46 at 17; Doc. 47 at ¶ 58), and subsequently interfered with his access to counseling by providing him with a wrong number for a counselor and then with a list of providers who were not within a reasonable distance from where his traveling crew was located, (*Id.*; Doc. 47 at ¶ 63). It is possible that a reasonable fact finder could conclude these actions interfered with Frost's medical treatment, making summary judgment inappropriate.

## II. BNSF's Motion to Bifurcate

BNSF moves to bifurcate the punitive damages from the rest of the trial. (Doc. 36.) BNSF argues bifurcation will (1) avoid unfair prejudice to BNSF; (2)

prevent the introduction of evidence that is irrelevant to the issues of liability or compensatory damages but relevant to punitive damages; and (3) serve the interests of judicial economy. (Doc. 37 at 3.) It further argues that trying punitive damages separately from liability and compensatory damages will not unfairly prejudice Frost. (*Id.*)

"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues . . . [or] claims. . . . When ordering a separate trial, the court must preserve any federal right to a jury trial." Fed. R. Civ. P. 42(b). Rule 42(b) "confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). "The burden is on the moving party to show bifurcation is warranted." *Burton v. Mtn. W. Farm Bureau Mut. Ins. Co.*, 214 F.R.D. 598, 612 (D. Mont. 2003).

BNSF argues a non-bifurcated trial creates a danger that the heightened standard of proof required for punitive damages will be diluted by the lower standard for liability and compensatory damages, thereby confusing the jury into applying an inappropriately low punitives standard. (Doc. 37 at 4.) It further argues that bifurcation will prevent the introduction of evidence that is relevant

-12-

only to punitive damages. (Doc. 37 at 7.) Contrary to BNSF's position, prejudice can be avoided by the use of limiting instruction. *Burton*, 214 F.R.D. at 614. Further, the evidence supporting BNSF's liability and the potential award of punitive damages is essentially the same: evidence which tends to show BNSF retaliated against Frost after he engaged in protected conduct.

BNSF further insists bifurcation would serve the ends of convenience and judicial economy, because the initial trial might obviate the need for a punitive damages phase, sharpen the focus of a punitive damages phase if necessary, and provide counsel with a clearer understanding of what can and cannot be argued at the first trial. (Doc. 37 at 8.) Those reasons, however, do not outweigh the potential time and cost involved in running two consecutive trials. It is also difficult to imagine how bifurcation would provide counsel with a clearer idea of what could be argued at trial. Instead, it would call for a potentially time-consuming dissection of exactly what evidence might indicate BNSF acted badly enough to trigger punitive damages under the Federal Railroad Safety Act. BNSF's motion to bifurcate is denied.

## III.    BNSF's Motion to Strike

BNSF seeks strike Frost's expert witness, George Gavalla, arguing Gavalla's testimony has no relevance to this case, requires no expertise, is unfairly

prejudicial to BNSF and confusing to the jury, and merely repeats what would otherwise be inadmissible evidence. (Doc. 42.) Gavalla spent seven years as the head of the Office of Safety for the Federal Railroad Administration, the office responsible for overseeing railroads. (Doc. 51 at 2, 5.) Before serving at the Office of Safety, Gavalla spent 18 years in the railroad industry, including time as the Director of Research for the Brotherhood of Railroad Signalman. (*Id.* at 5.) He also worked as a Safety Project Coordinator for the Federal Railroad Administration. (*Id.*) Frost proposes to have Gavalla testify as to the importance of railroad safety inspections, the enforcement of federal railroad regulation, the purpose of and need for anti-retaliation regulation, and the importance of employee injury reporting. (*Id.* at 2.) BNSF's motion is denied.

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" so long as four factors are met–the expert's specialized knowledge: (1) "help[s] the trier of fact to understand the evidence or to determine a fact in issue, (2) is "based on sufficient facts or data," (3) is "the product of reliable principles and methods," and (4) has been "reliably applied" to the facts of the case. Fed. R. Evid. 702. To be admissible, evidence must be relevant, Fed. R. Evid. 402, meaning it is both material and probative, Fed. R. Evid. 401. Relevant evidence may be excluded if

its probative value is substantially outweighed by prejudice, confusion, or waste of time, inter alia.  Fed. R. Evid. 403.

### A.    Gavalla's expert status and the relevance of his testimony

BNSF argues Gavalla's opinions that retaliation and non-compliance with the Federal Railroad Administration reporting requirements may chill reporting of injuries and safety concerns are conclusions the jury would be able to reach on its own, and are thus not expert opinions.  (Doc. 43.)  This argument overlooks Gavalla's extensive experience in the railroad industry and his corresponding knowledge of matters beyond that of the layman.  Railroad administration and regulation are topics likely outside "the understanding of the average juror." *United States v. Rahm*, 993 F.2d 1405, 1412 (9th Cir. 1993).  Properly bounded, Gavalla's testimony will leave for the jury the question of whether the BNSF retaliated against Frost.

In a related argument, BNSF asserts Gavalla's testimony is unrelated to the facts of this case, and that therefore his testimony cannot be material.  (Doc. 43 at 9.)  BNSF cites to Gavalla's deposition, wherein Gavalla states he "ha[s] not seen any information regarding the specifics of [Frost's] dismissal and BNSF's actions so [he is] not prepared to offer any opinions on that."  (*Id.* at 10.)  BNSF also argues Gavalla's opinions do not relate to BNSF for any period of time relevant to

this case, and that because he has not formed any opinions as to BNSF's particular behavior in this instance, or BNSF's Internal Control Plan, his testimony should be excluded.  (Doc. 43 at 11.)

Gavalla's testimony in a similar context has been addressed in *Whitt v. Union Pac. R. R. Co.*, where the plaintiff brought a Federal Railroad Safety Act claim alleging the railroad delayed his access to medical care.  2014 WL 3943135, *2 (D. Neb. Aug. 12, 2014).  The *Whitt* court permitted Gavalla's testimony

> generally as to the safety rules and safety regulations that railroads are
> required to implement, [the defendant railroad's Internal Control Plan]
> and its requirements, the importance of accurate reporting by railroads
> and why the [Federal Railroad Administration] needs such accurate data,
> the purpose of an [Internal Control Plan], categories of conduct that
> violate [Federal Railroad Administration] regulations and [defendant
> railroad's Internal Control Plan], the reasons that accurate data may not
> be reported and why the reporting of accurate data matters.

2014 WL 3943135, *3-4.  The *Whitt* court also noted that "if Mr. Gavalla strays too far from that which is relevant in this case, the defendant is free to object and the Court will rule on the objection at that time."  *Id.* at *4.  It also barred Gavalla from testifying "that certain behaviors violated the federal law."  *Id.*

Here, it Gavalla is likewise allowed to testify generally regarding railroad safety rules and regulations, the purpose and requirements of BNSF's Internal Control Plan, the importance of accurate injury reporting by railroads and the

Federal Railroad Administration's need for such data, categories of conduct that

violate Federal Railroad Administration regulations and the Internal Control Plan,

and reasons accurate injury data may not be reported.  Gavalla will not be

permitted to testify as to whether BNSF violated any law or regulation in the

instant case.  BNSF is free to object if Gavalla's testimony strays from these areas.

It will be for the jury to assess his credibility, his biases, and the limits of his

knowledge by observing his testimony and any cross-examination BNSF conducts.

## B.     The hearsay rule, character, and pattern and practice evidence

Finally, BNSF argues Gavalla's testimony should be barred because it

repeats inadmissible hearsay evidence disguised as expert opinions.  (Doc. 43 at

13.)  Hearsay is a statement, not made at the current trial or hearing, offered by a

party for the truth of the matter the statement asserts.  Fed. R. Evid. 801(c).

Hearsay is generally inadmissible.  Fed. R. Evid. 802.  However, "experts are

entitled to rely on hearsay in forming their opinions."  *Carson Harbor Village,*

*Ltd. v. Unocal Corp.*, 270 F.3d 863, 873 (9th Cir. 2001) (citing Fed. R. Evid. 703,

*United States v. McCollum*, 732 F.2d 1419, 1422-23 (9th Cir. 1984)).  Federal

Rule of Evidence 703 provides as follows:

> An expert may base an opinion on facts or data in the case that the
> expert has been made aware of or personally observed.  If experts in the
> particular field would reasonably rely on those kinds of facts or data in

forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would be otherwise inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Gavalla may therefore rely on hearsay in forming his opinions.

BNSF also asserts that, because Gavalla's expert report includes other administrative decisions, lawsuits, complaints, and OSHA findings and investigations, his testimony constitutes impermissible character evidence. (Doc. 43 at 14.) BNSF is correct that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a). However, Frost wishes to introduce Gavalla's testimony not to show BNSF acted "in accordance" with a character trait, but to educate the jury about railroad regulation and potential financial incentives (in other words, to provide circumstantial evidence of motive). Further, "evidence of . . . an organization's routine practice may be admitted to prove that on a particular occasion the . . . organization acted in accordance with the habit or routine practice." Fed. R. Evid. 406.

Lastly, BNSF argues Gavalla's opinions "are quintessential 'pattern or practice' evidence, which is not admissible in Federal Rail Safety Act lawsuits." (Doc. 43 at 14.) To support this proposition, BNSF cites to an administrative

decision which notes, among other things, that while the Federal Rail Safety Act does not provide a "pattern and practice" cause of action, "[e]vidence of widespread retaliation . . . could support Complainant's claim for punitive damages: It could show the Railroad's conscious disregard of workers' federal statutory rights." *Jensen v. Union Pac. R. R. Co.*, 2011-FRS-00005, at 11 (ALJ Aug. 19, 2011) (Doc. 43-10 at 11). Further, Frost alleges retaliation, not pattern and practice. BNSF's argument is unavailing.

## IV.   Motions in Limine

A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area. *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). Courts have "wide discretion" in considering and ruling upon a motion in limine. *Ficek v. Kolberg–Pioneer, Inc.,* 2011 WL 1316801, at *1 (D. Mont. Apr. 5, 2011) (citing *Trichtler v. Co. of Lake,* 358 F.3d 1150, 1155 (9th Cir. 2004)). A court will grant a motion in limine and exclude evidence only if the evidence is "inadmissible on all potential grounds." *BNSF Ry. v. Quad City Testing Lab., Inc.,* 2010 WL 4337827, at *1 (D. Mont. 2010).

BNSF seeks to exclude fifteen categories of evidence at trial. (Docs. 38, 40), while Frost requests exclusion of all evidence related to the fact that Frost was

still legally married at the time he began his relationship with his now girlfriend, Laci Bogden, (Doc. 39). Each request is ruled on individually below.

## A.     BNSF's Motion

BNSF's motion in limine is granted-in-part and denied-in-part, consistent with the following:

BNSF's category "I" seeks to exclude opinion testimony regarding BNSF's motive. (Doc. 38 at 2.) That request is granted to the limited extent that witnesses may not testify as to what the BNSF organization thinks. BNSF's category "IX" seeks to exclude reference to plaintiff's OSHA complaints and OSHA findings. (*Id.*) That request is granted to the limited extent that legal conclusions within plaintiff's OSHA complaints and OSHA findings may not be introduced. BNSF's category XIII seeks to exclude counsel's personal beliefs and feelings, (*Id.* at 3), and is granted. BNSF's category XV, (*Id.*), seeks to exclude any references to Berkshire Hathaway, Warren Buffet, or BNSF's financial condition, and is granted as well.

BNSF's requests regarding categories "VIII" and "XII" are denied, subject to renewal at trial. BNSF's remaining requests are denied.

## B.     Frost's Motion

Frost seeks to exclude evidence that he was still legally married when he began a relationship with Laci Bogden.  (Doc. 39 at 2.)  BNSF argues that the timing of Frost's divorce is relevant to Frost's damage claims and the timing of Frost's relationship with Ms. Bogden is relevant to the foundation for her opinion of his emotional distress.  (Doc. 49.)  Frost's motion is granted to the extent BNSF seeks to imply or suggest an inappropriate personal relationship between Frost and Bogden.

## V.     Frost's Motion to Compel and BNSF's Motion for a Protective Order

Frost moves to compel production of documents and responses to interrogatories.  (Doc. 26.)  BNSF in turn moves for a protective order regarding 11 deposition topics identified by Frost in his Federal Rule of Civil Procedure 30(b)(6) notice of deposition.  (Doc. 29 at 5.)  Those motions are granted-in-part and denied-in-part consistent with the explanation below.

Pursuant to Rule 26(b)(1) of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  A court "must limit the frequency or extent of discovery otherwise allowed" if it determines that the discovery sought is "unreasonably cumulative or duplicative" or "outside the scope permitted by Rule 26(b)(1)," or that "the party seeking discovery has had

ample opportunity to obtain the information by discovery in the action." Fed. R. Civ. P. 26(b)(2)(c). "Based on the liberal discovery policies of the Federal Rules of Civil Procedure, a party opposing discovery carries a 'heavy burden' of showing why discovery should not be allowed." *Moe v. System Transport, Inc.*, 270 F.R.D. 613, 618 (D. Mont. 2010) (citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)). The 2015 Amendment to Rule 26(b)(1) emphasized the importance of proportionality in discovery requests. 2015 Committee Notes. However, the change was not "intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional." *Id.*

The discovery rules also provide that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Evid. 26(c)(1). That protection can take the form of "forbidding the disclosure or discovery" or "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed. R. Evid. 26(c)(1)(A),(D). "A party asserting good cause bears the burden . . . of showing that specific prejudice or harm will result if no protective order is granted." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) (citing *Phillips v. Gen. Motors*, 307 F.3d 1206, 1212 (9th Cir. 2002)).

**A.    Frost's Motion to Compel**

Frost makes five requests in his motion to compel.  Each request is addressed below.

The motion is granted as to Frost's first and second requests.  (Doc. 27 at 19.)  BNSF indicated at the motions hearing that the Personal Performance Index cannot be produced because it does not exist as a document but rather as a matrix or algorithm for computing an employee's score.  If for this reason the Personal Performance Index does not exist or cannot be produced, BNSF is ordered to produce a witness competent to testify as to the purpose and function of the Index.

Frost's third request is granted-in-part.  (*Id.*)  BNSF shall produce any documents, electronic or otherwise, from 2011-2013 related to a safety audit.

Frost's fourth request is granted-in-part.  (*Id.*)  BNSF shall produce the citations and defects which it received from January 1, 2011 through December 31, 2013 for the regions in which Frost worked during that time.

Frost's fifth request is granted-in-part.  (*Id.*)  BNSF shall produce in response to Frost's Document Request No. 8 and Interrogatory No. 13 regarding 49 U.S.C. § 20109 related complaints, grievances, and lawsuits from 2011 to present.

Frost's motion is denied in all other respects.

**B.      BNSF's Motion for a Protective Order**

BNSF requests this Court forbid inquiry into 11 topics identified by Frost in his Rule 30(b)(6) notice of deposition.  (Doc. 28 at 2; Doc. 29 at 5.)  These requests are addressed below.

BNSF's request regarding Frost's notices nos. 3 and 4 is granted-in-part because those topics are overbroad.  The "not limited to" language is stricken, and Frost's inquiry is limited to the areas enumerated in the notices.

BNSF's request regarding Frost's notice no. 5 is granted-in-part because the topic is overbroad.  The topic is limited to BNSF's policies and practices preventing retaliation, harassment, or discrimination for an employee reporting injury, and to complaints of retaliation, harassment or discrimination for reporting an injury within the Montana division between January 2, 2011and January 1, 2016.

BNSF's request regarding Frost's notice no. 6 is granted-in-part because the topic again is overbroad.  The "including but not limited to" language is stricken, and Frost's inquiry is limited to the areas the notice enumerates.

BNSF's request regarding Frost's notice no. 9 is granted.  Frost has not advanced a claim under the Federal Employer's Liability Act and so inquiries about the effect of that law are not relevant.  The topic would also require BNSF

to speculate about the actions of the Federal Railroad Administration.

BNSF's request regarding Frost's notice no. 10 is granted-in-part. The general effect of the Federal Railroad Administration's oversight on BNSF's profits is an overbroad and vague topic. Frost may inquire as to the relationship between Federal Railroad Administration oversight and injury reporting.

BNSF's remaining requests are denied.

## CONCLUSION

Consistent with the above,

IT IS ORDERED that BNSF's Motion for Partial Summary Judgment (Doc. 30), Motion to Bifurcate (Doc. 36), and Motion to Strike (Doc. 42) are DENIED.

IT IS FURTHER ORDERED that BNSF's Motion in Limine (Doc. 38) is GRANTED-IN-PART and DENIED-IN-PART. Frost's Motion in Limine (Doc. 39) is GRANTED-IN-PART and DENIED-IN-PART.

IT IS FURTHER ORDERED that Frost's Motion to Compel (Doc. 26) is GRANTED-IN-PART and DENIED-IN-PART. BNSF's Motion for a Protective Order (Doc. 28) is GRANTED-IN-PART and DENIED-IN-PART.

IT IS FURTHER ORDERED THAT Frost's Motion to Extend the Discovery Deadline (Doc. 54) is DENIED as moot.

DATED this 31st day of October, 2016.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT